IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PATRICK J. GAGE,

                              Petitioner,
                                                          OPINION and ORDER
        v.
                                                            16-cv-849-jdp
WARDEN RICHARDSON,

                              Respondent.

Petitioner Patrick J. Gage was convicted, after a jury trial, of two counts of first-degree sexual assault of a child and one count of second-degree sexual assault of a child. *State v. Gage*, Case No. 2009CF89 (Juneau County). He was sentenced to 33 years of imprisonment to be followed by 21 years of extended supervision. Gage filed an unsuccessful motion for postconviction relief in the trial court and a direct appeal. The court of appeals rejected Gage's arguments and the Wisconsin Supreme Court denied his petition for review.

Gage now seeks a writ of habeas corpus under 28 U.S.C. § 2254, challenging both his conviction and his sentence for various reasons. The state filed an answer, with records from the relevant state court proceedings, and the motion is fully briefed. For the reasons set forth below, I conclude that Gage has failed to establish that the Wisconsin Court of Appeals unreasonably applied clearly established federal law when it rejected his claims and affirmed his conviction. Accordingly, his petition will be denied.


BACKGROUND

The following facts are taken from the petition and the state court records provided by Gage and the state.

## A. Gage's arrest and trial

In Juneau County Case No. 2009CF89, Gage was charged with six counts of sexual assault. Four of the counts related to his daughter, H.R.G., while H.R.G. was still a child. The first two counts were alleged to have taken place at H.R.G.'s grandmother's (Gage's mother's) house between spring 2001 and May 2004, when H.R.G. was between nine and 12 years old. The third count was alleged to have taken place in a cabin that was built behind the grandmother's house when H.R.G. was 12 years old. The fourth count was alleged to have occurred at a house where Gage lived in Lyndon, Wisconsin, when H.R.G. was younger than 16 years old. The other two counts charged Gage with repeated sexual assault of A.L.P., the daughter of Gage's former girlfriend.

Pending trial, Gage was out on a signature bond and was permitted to live in the Cayman Islands. Without notifying his lawyer or the court, he moved to his new wife's home country, Canada. He subsequently failed to appear for a mandatory court appearance and was later featured on an episode of the television show "America's Most Wanted." He was ultimately found and brought back to the United States to face trial. (He was charged with bail jumping, but that charge was later dismissed after he was sentenced in the sexual assault case.) The television show provided a plaque commemorating Gage's capture that was displayed in the Juneau County courthouse. The plaque included the America's Most Wanted logo and the words "Capture 1121 Patrick Gage," in small print at the bottom of the plaque.

Gage proceeded to a three-day jury trial in November 2011. The state called six witnesses: H.R.G., H.R.G.'s mother, A.L.P., A.L.P.'s mother, and two detectives. Gage was the only witness who testified on his behalf.

H.R.G. testified that she and her older brother, Josh, visited their dad, Gage, at her grandmother's house on weekends, one day during the week, and sometimes for entire summers. She, Josh, and Gage slept in the basement of her grandmother's house. Dkt. 10-13 at 233–34. The basement consisted of a living room, a bedroom, and a sewing room. *Id.* H.R.G.'s grandmother had offered H.R.G. a bedroom upstairs, but H.R.G. chose to sleep downstairs with Josh and Gage. *Id.* at 243–46. H.R.G. testified that her dad was asleep usually before she or Josh fell asleep. *Id.* at 247.

H.R.G. testified that Gage sexually assaulted her at her grandmother's house "almost every time [she] visited," and that she could not specify an exact number of assaults because they happened "so frequently." Dkt. 10-13 at 196. The first incident that she could remember, and which was the basis for count 1, occurred downstairs in the bedroom at her grandmother's house, after everyone had gone to sleep. *Id.* at 196–97. H.R.G. said that she was sleeping in a bed with her dad and he started touching her breasts over her clothes and then tried to put his penis in her mouth. *Id.* at 199–200. H.R.G. testified that she rolled away from him and that they both went back to sleep without saying anything to each other. *Id.* at 201. H.R.G.'s brother, Josh, was asleep on the couch in the adjacent living room about 10 feet away at the time. *Id.* at 233. On cross-examination, H.R.G. testified that the first time she told anyone the details of this assault was in preparation for trial because she had not remembered the details before that. *Id.* at 236–37.

H.R.G. testified that the second assault (count 2) occurred at her grandmother's house during the summer of 2001. *Id.* at 204. That time, Gage assaulted her while they were sleeping on the pullout couch in the living room downstairs, while her brother Josh was in the adjacent

bedroom. *Id.* at 201. H.R.G. agreed on cross-examination that her brother or grandmother could have walked into the room at any time during the assault. *Id.* at 240.

H.R.G. testified that the third assault (count 3) took place at a cabin on her grandmother's property where she, Josh, and Gage lived for a summer. *Id.* at 205–06. The cabin had a bedroom, where Josh slept, a loft, where H.R.G. slept, and a living room, where Gage slept. H.R.G. testified that while Josh was in the bedroom, Gage climbed the ladder up to the loft area and assaulted her. *Id.* at 208, 242. Gage stopped when she started to cry and then they played video games. *Id.* at 211–12. H.R.G. agreed on cross-examination that sound traveled throughout the cabin. *Id.* at 243.

The fourth assault (count 4) occurred at a small house in Lyndon, Wisconsin. H.R.G. testified that Josh was asleep in the bedroom adjacent to the living room, when Gage came home late, sat on the couch, and began touching her vagina over her clothes. *Id.* at 222–23. H.R.G. kicked Gage and he stopped touching her. *Id.* H.R.G. agreed on cross-examination that the house was small and that if someone had walked out of the bedroom, that person would have seen whatever was happening on the couch. *Id.* at 265–66.

H.R.G. also testified that she had seen what she thought was Gage touching the other victim, A.L.P. while Gage and A.L.P. were lying on a couch. *Id.* at 216.

Defense counsel's strategy was to question H.R.G.'s credibility. Counsel pointed out that there was no physical evidence or witnesses to corroborate H.R.G.'s testimony that Gage had assaulted her. Counsel argued that H.R.G.'s lack of detail cast doubt on her allegations, as did the lack of privacy in the houses in which H.R.G. said that she had been assaulted. Dkt. 10-15 at 156, 162–64, 166, 184. In his closing arguments, defense counsel pointed to Josh's proximity to the assaults and to the fact that either Josh or H.R.G.'s grandmother could have

walked in at any moment. Defense counsel also questioned why the state had not called either Josh or the grandmother as a witness. *Id.* at 179–80.

In his rebuttal closing, the prosecutor countered that the defense could have called Josh as a witness. The prosecutor argued, "If Patrick Gage wanted his son to testify, he could have brought him here. . . He could have called his own son. Maybe it's because Josh had nothing to say." *Id.* at 205.

The jury found Gage not guilty of the first count of sexual assault involving H.R.G. and not guilty on both counts of sexual assault involving A.L.P. The jury convicted Gage on counts 2, 3, and 4 relating to H.R.G.

## B. Sentencing

Gage's presentence investigation report placed Gage in the lowest risk categories for both general recidivism and violence under the COMPAS actuarial assessment tool. But the presentence investigation agent stated that no actuarial instruments focusing on the risk of *sex offense* recidivism had been administered and that such risk assessments could be helpful. The agent then discussed Gage's history, including that Canadian authorities had dropped other charges of sexual abuse involving the niece of Gage's current wife when Gage was extradited, that Gage's younger sister had alleged that Gage had touched her sexually when she was between the ages of 12 and 14, and that Gage's ex-wife had alleged that he was emotionally abusive, verbally abusive, manipulative, controlling, and had insisted that she engage in unwanted sexual acts. Finally, the agent noted that Gage denied any sexual abuse of the victim, sister, and ex-wife, and Gage had given no opinion as to why the daughter of his former girlfriend and niece of his current wife would accuse him of sexual assault. The agent concluded

that Gage's denial was an "aggravating factor," and that those in denial "are at higher risk, and are not amenable to treatment." Dkt. 10-10 at 11.

At the sentencing hearing in January 2012, the prosecutor and defense counsel made arguments about the presentence investigation report and the COMPAS assessment in particular. The judge noted that he was not giving the assessment much weight because he thought Gage's continued denial of wrongdoing and his moving to Canada without notifying the court showed that Gage needed extensive supervision. Dkt. 10-16 at 79. The judge also stated that Gage had moved to Canada likely to avoid prosecution. *Id.* at 67, 71. The judge ultimately sentenced Gage to 33 years of imprisonment to be followed by 21 years of extended supervision.

## C. Postconviction motion and evidentiary hearing

Gage filed a postconviction motion contending that: (1) trial counsel was ineffective by failing to (a) interview and present evidence from Josh Gage, (b) interview and present evidence from Nancy Gage (Gage's mother), (c) seek removal of the America's Most Wanted plaque commemorating Gage's arrest; (2) Gage's sentence should be modified because (a) of new information regarding his likelihood of sex offense recidivism, (b) the court put undue weight on his missing a court appearance after he had moved to Canada, and (c) his sentence was unduly harsh. The circuit court held an evidentiary hearing on the motion at which Josh Gage, Nancy Gage, and Gage's trial counsel testified.

### 1. Josh Gage's testimony

Josh Gage is one-and-a-half years older than H.R.G. Dkt. 10-17 at 59. For the most part, Josh's testimony at the postconviction hearing was consistent with H.R.G.'s testimony at trial. He testified that he and H.R.G. visited their father every other weekend, one day during

the week, and most of the summer. *Id.* Josh's description of his grandmother's house was consistent with H.R.G.'s and Gage's description of the house at trial. Josh testified that he, H.R.G., and Gage slept in the basement, which consisted of a living room, small bedroom, and his grandmother's sewing room. *Id.* at 61–62. Josh testified that H.R.G. usually slept in one corner of a large L-shaped couch in the living room of the basement and that he usually slept on the pullout bed portion of the couch, but occasionally slept in the bedroom. *Id.* at 63. Josh testified that he did not remember H.R.G. sleeping in the bedroom, which is where H.R.G. testified that count 1 took place, though Josh agreed that it was possible that she slept in the bedroom a few times. *Id.* at 79.

Josh also testified that Gage would usually fall asleep in a recliner by 8 p.m. *Id.* at 65. Josh would sometimes try to move Gage into the bedroom, but that he would sometimes just leave Gage in the recliner. Josh stayed up late playing video games or watching movies, and he did not go to sleep until between 1 a.m. and 3 a.m. on most nights. *Id.* at 64. He was usually the last to go to sleep and would turn off the television and lights. *Id.* at 67.

As for the cabin, where H.R.G. testified that count 3 took place, Josh testified that he and H.R.G. helped Gage build the cabin and that it was an enjoyable experience. *Id.* at 68. Josh described the cabin as small and testified that sound traveled through it. *Id.* at 69. He also testified that the loft where H.R.G. slept was directly above his bedroom and that the ladder up to the loft made a "creaky noise" when someone climbed it. *Id.* at 70. Josh testified that he stayed up the latest in the cabin, just as he had when he and H.R.G. had slept inside his grandmother's house. *Id.*

Josh also lived with H.R.G. and Gage at the house in Lyndon, where count 4 occurred. Josh testified that the Lyndon house was a little bit bigger than the cabin, with one bedroom,

a living room, and a bathroom. *Id.* at 71. Josh testified that, as in their other residences, Gage went to sleep early, followed by H.R.G., then Josh. *Id.*

Josh testified that he never saw Gage touch H.R.G. in a sexual way. *Id.* at 66. He also testified that after Gage was charged with assaulting H.R.G., he and Gage did not have much of a relationship. *Id.* at 75. He spoke with him only twice between the time Gage was arrested and his trial. *Id.*

### 2. Nancy Gage's testimony

Nancy Gage, Gage's mother and H.R.G.'s grandmother, testified at the postconviction hearing that she believed Gage and H.R.G. had a normal father-daughter relationship and that she never witnessed any change in their relationship during the time H.R.G. and Josh lived at her house. *Id.* at 89. Nancy testified that she was the primary caregiver for the children while they were visiting and Gage was working, that she had a close relationship with H.R.G., and that she talked with H.R.G. regularly. *Id.* Nancy testified that she routinely stayed up late, until around 11 p.m., and would use her sewing room in the basement in the evenings. *Id.* at 91. To access her sewing room, Nancy walked through the living room in the basement where H.R.G., Gage, and Josh stayed. *Id.* at 90. She also testified that from the top of the basement stairs, she could hear conversations in the living area of the basement. *Id.*

### 3. Trial counsel's testimony

Trial counsel testified at the hearing that he did not interview either Josh or Nancy before trial. *Id.* at 15, 23. He testified that before trial, he knew that Josh was usually with H.R.G. when she visited Gage, that Josh slept in the same immediate area as H.R.G., and that Josh had told police that he never saw anything sexual between Gage and H.R.G. *Id.* at 20–22. But trial counsel was under the impression that Josh and Gage did not have a good relationship,

that Josh was upset with Gage, that Josh and Gage had not maintained communication prior to the trial, and that Josh had told police that H.R.G. had not hung around Gage much while she visited him in the Cayman Islands. *Id.* at 22. Counsel also testified that he had received information before trial that Josh may have assisted law enforcement in trying to locate Gage when he was in Canada. *Id.* at 34. Counsel testified that he weighed his concerns that Josh may be a hostile witness with Josh's potential testimony, and concluded that Josh was not a "viable witness" and that his testimony would have "very limited value." *Id.* at 53–54

As for Nancy Gage, trial counsel testified that before trial, he believed Nancy was "the only witness that really had substantive or potentially substantive material." *Id.* at 14. Trial counsel listed Nancy as a witness on his witness list. However, counsel chose not to interview her or call her as a witness because he believed that she would have testified that she never saw any suspicious interactions between Gage and H.R.G., and "that's what one would expect one's mother to say." *Id.* at 43–44.

Finally, trial counsel testified that he did not file a motion to remove the America's Most Wanted plaque because he thought filing a motion would bring unnecessary attention to the plaque and also because he did not think any jurors would notice it. *Id.* at 28–29.

### 4. Circuit court's decision

The circuit court made an oral ruling denying Gage's postconviction motion in its entirety. The court first addressed the America's Most Wanted plaque, concluding that Gage had not shown that he was prejudiced by trial counsel's failure to request removal of the plaque. Dkt. 10-18 at 11. In particular, the court noted that Gage had not shown that any juror ever noticed the plaque or that it affected the jury's judgment in any way. *Id.* at 12.

As for counsel's failure to interview or call Josh and Nancy Gage as witnesses, the trial court recognized that "in this case, credibility was in almost everything. . . It is, as it was phrased, a 'he–said–she–said' type of case. And so the impeachment or undermining of the credibility of [H.R.G.] would have been of great significance." *Id.* at 13. However, the trial court concluded that counsel exercised reasonable defense strategy by declining to interview or call Josh based on counsel's belief that Josh and Gage were estranged and that Josh would be on H.R.G.'s side. *Id.* at 16. As for Nancy, the trial court stated that "Nancy's testimony, if believed by the jury, would have undermined the credibility of [H.R.G]," but that the court accepted that "a jury might discount her testimony as being a loving mother supportive of her son." *Id.* at 18.

The circuit court also rejected Gage's request for a sentence modification based on new information. After Gage was sentenced, he had hired a clinical psychologist to conduct a psychosexual evaluation. The psychologist concluded that Gage had no major mental illness, evaluated psychopathy, or sexual deviance, and was at low risk for future sexual offending. The psychologist noted specifically that "within the area of sex offender risk assessment, denial is not a risk factor associated with increased recidivism risk." Dkt. 10-10 at 12. The court rejected Gage's argument that his sentence should be modified based on the new information contained in the evaluation, concluding that the evaluation did not qualified as new information that would justify reconsidering Gage's sentence. Dkt. 10-18 at 20, 22.

Finally, the circuit court rejected Gage's argument that the court had placed too much weight on Gage missing a court appearance after he moved to Canada. The court noted that the missed appearance was only one factor it had considered in deciding on a sentence. *Id.* at 26. The court further explained that the lengthy sentence was motivated primarily by the

sentencing judge's intention that Gage remain in prison until his sexual desires toward his daughter would have "faded." *Id.* at 32.

## D. Wisconsin Court of Appeals' decision

The Wisconsin Court of Appeals affirmed the circuit court's denial of Gage's postconviction motion. Dkt. 10-10. The court of appeals concluded that Gage had failed to show that he was prejudiced by counsel's failure to call Josh or Nancy Gage as witnesses. The court noted that Josh's and Nancy's testimony was consistent with H.R.G.'s trial testimony regarding the layout of the basement and the general sleeping arrangements. *Id.* at 9. Josh's testimony that he "'usually' slept on the couch and sometimes slept in the bedroom [did] not contradict the victim's testimony that each of the siblings sometimes slept in the bedroom and sometimes slept on the sectional couch with the pullout bed in the living room area." *Id.* Similarly, Josh's testimony that he was "*generally* the last person to go to bed" and that he "never witnessed any sexual conduct between Gage and his sister" did not undermine the victim's account that the incidents would occur after everyone had gone to sleep. *Id.* The court stated that "the implication of the victim's testimony was that Gage would approach her late at night *after* she and her brother had gone to bed, sometimes waking her up." *Id.* (emphasis in original). As for Nancy Gage, the court of appeals stated that her testimony that "she did not generally go into the basement at night was consistent with the victim's testimony and did not show that Gage's mother would have been in position to witness any of the alleged incidents." *Id.* The court concluded that it did not "view the additional testimony that the victim's brother or Gage's mother could have provided as undermining the victim's account in any significant way." *Id.* at 10.

The court of appeals rejected Gage's claim based on counsel's failure to object to the America's Most Wanted plaque because Gage had "failed to show that any juror had seen the plaque, must less noticed Gage's name on it." *Id.* at 9.

Finally, the court of appeals denied Gage's requests for sentence modification, concluding that Gage had failed to show that a post-sentencing psychosexual evaluation qualified as a "new sentencing factor" that justified resentencing or that the sentencing court had placed undue weight on his failure to notify anyone about his move to Canada or his failure to appear at a mandatory court hearing after his move. *Id.* at 13–14.

Gage appealed, and the Wisconsin Supreme Court denied his petition for review. He filed his habeas petition in this court on December 27, 2016.

ANALYSIS

In his habeas petition, Gage seeks relief on the grounds that: (1) trial counsel was ineffective for failing to interview and call as witnesses his son, Josh Gage, and his mother, Nancy Gage; (2) trial counsel was ineffective for failing to file a motion to have the court remove the plaque in the courthouse lobby congratulating the county sheriff on arresting Gage; (3) the trial court relied on in accurate information at sentencing to conclude that Gage was a sex offender "in denial" with a high risk of recidivism, despite a later psychosexual evaluation showing that Gage was at a low risk of recidivism; and (4) the trial court erred at sentencing by placing undue weight on Gage missing a court appearance in 2010 and believing incorrectly that Gage had attempted to flee prosecution by moving to Canada.

Because the Wisconsin Court of Appeals addressed the merits of Gage's claims, my review is subject to the deferential standard of review under 28 U.S.C. § 2254(d)(1). Under

§ 2254(d)(1), Gage is not entitled to relief unless he shows that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." A decision is "contrary to" clearly established federal law "if the rule the decision applies differs from governing law set forth in Supreme Court cases." *Bailey v. Lemke*, 735 F.3d 945, 949–50 (7th Cir. 2013) (citations omitted). A decision involves an "unreasonable application" of Supreme Court precedent "if the decision, while identifying the correct governing rule of law, applies it unreasonably to the facts of the case." *Id.*

Alternatively, Gage can obtain relief if he shows that the state court's adjudication of his claims was based upon an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2). But again, the federal court owes deference to the state court. The underlying state court findings of fact and credibility determinations against a petitioner are presumed correct unless the petitioner comes forth with clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Campbell v. Smith*, 770 F.3d 540, 546 (7th Cir. 2014); *Newman v. Harrington*, 726 F.3d 921, 928 (7th Cir. 2013).

## A. Ineffective assistance of trial counsel

Claims for ineffective assistance of counsel are analyzed under the well-established standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under the *Strickland* standard, a defendant must demonstrate both constitutionally deficient performance by counsel and actual prejudice as a result of the alleged deficiency. *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000). To demonstrate deficient performance, the petitioner must show "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. To demonstrate actual prejudice requires a defendant to demonstrate "a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

### 1. Failure to interview and call Josh Gage and Nancy Gage as witnesses

Gage contends that the Wisconsin Court of Appeals applied *Strickland* unreasonably when it rejected his ineffective assistance claim based on his trial counsel's failure to interview or call Josh Gage and Nancy Gage as witnesses. To prevail on this claim, Gage faces a heavy burden: when *Strickland*'s deferential standard for measuring attorney performance is viewed through the lens the deferential standard in § 2254(d), the result is a doubly deferential form of review that asks only "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. 86, 89 (2011). This means that "only a clear error in applying *Strickland* will support a writ of habeas corpus." *Allen v. Chandler*, 555 F.3d 596, 600 (7th Cir. 2009). So long as the Wisconsin Court of Appeals "took the constitutional standard seriously and produced an answer within the range of defensible positions," this court must deny relief. *Taylor v. Bradley*, 448 F.3d 942, 948 (7th Cir. 2006) (citation omitted).

Gage first argues that it was clearly deficient performance for his trial attorney to fail to interview or call Josh or Nancy Gage as witnesses at trial. On this prong of *Strickland*, I agree with Gage. The "Constitution does not oblige counsel to present each and every witness that is suggested to him," and a "lawyer's decision to call or not to call a witness is a strategic decision generally not subject to review." *Adams v. Bertrand*, 453 F.3d 428, 434–35 (7th Cir. 2006) (citation omitted). But as the Court of Appeals for the Seventh Circuit has explained, "[f]ew decisions not to present testimony can be considered 'strategic' before some investigation has taken place," and "[a]n outright failure to investigate witnesses . . . is more

likely to be a sign of deficient performance." *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005). *See also Rompilla v. Beard*, 545 U.S. 374, 387 (2005) ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.") (citation omitted); *Mosley v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012) (not reasonable trial strategy to fail to call witnesses who were never even interviewed).

In this instance, the record does not support a conclusion that trial counsel's failure to investigate Josh's and Nancy's potential testimony was reasonable or strategic. Counsel knew that the state had no physical evidence or witnesses to corroborate H.R.G.'s testimony regarding the assaults. Counsel also knew that Josh was present in the houses where each of the assaults occurred and that Nancy was in the residence where at least two of the assaults occurred. Finally, counsel knew that the case against Gage would essentially boil down to a credibility contest between Gage and H.R.G. Any testimony that would undermine H.R.G.'s allegations could be critical. But counsel failed to even investigate whether Josh or Nancy could have provided testimony to bolster Gage's defense.

Counsel's reasons for failing to investigate either witness are not persuasive. Counsel testified at the postconviction hearing that he thought that Josh may have given unfavorable testimony because he did not have a good relationship with Gage. As for Nancy, counsel considered calling her but decided that the jury would discount her testimony as biased in favor of her son. Counsel's explanation that he thought the jury would discount Nancy's testimony as biased appears disingenuous, in light of the fact that counsel called Gage in his own defense. Additionally, trial counsel could not reasonably reject Josh and Nancy as potential witnesses until he at least interviewed them to find out what their testimony would be. Because he never

found out what Josh's or Nancy's testimony would be, trial counsel could not have made a reasonable professional judgment that their testimony would have been dangerous, bolstered the state's case, or added nothing of significance. *See Toliver v. McCaughtry*, 539 F.3d 766, 775 (7th Cir. 2008) ("[C]ounsel could not have made a reasonable strategic decision not to call [potential witness] without interviewing him in order to evaluate his proposed testimony, his credibility or his demeanor.").

Although I conclude that Gage's trial counsel performed deficiently, that conclusion does not end the *Strickland* analysis. The Wisconsin Court of Appeals did not reject Gage's ineffective assistance claim based on the deficient performance prong of *Strickland*. The court of appeals instead concluded that Gage did not suffer prejudice from his attorney's failure to call Josh and Nancy as witnesses. The question for this court is whether the court of appeals applied *Strickland* unreasonably in concluding that Gage had not shown prejudice. *See Carter v. Duncan*, 819 F.3d 931, 943 (7th Cir. 2016) (even if counsel's performance was deficient for failing to interview potential witnesses, conviction must be upheld if state court's prejudice analysis was not unreasonable). So long as the state court's conclusion is "one of several equally plausible outcomes," I must allow the decision to stand. *Frentz v. Brown*, 876 F.3d 285, 295 (7th Cir. 2017).

The court of appeals concluded that Gage was not prejudiced by counsel's failure to call Josh or Nancy Gage as witnesses at trial because the proffered testimony would not have changed the outcome of the trial. In reaching this conclusion, the court of appeals failed to discuss some noteworthy statements in Josh's and Nancy's proffered testimony. Josh's and Nancy's testimony that they never witnessed any sexual touching or unusual behavior between Gage and H.R.G. would have made H.R.G.'s testimony at trial that Gage sexually assaulted her

"almost every time [she] visited" at least somewhat doubtful. Josh's testimony about the close sleeping quarters in all three residences where the assaults occurred and the creaky ladder in the cabin supports the defense's theory that Josh would have likely heard or seen at least one of the assaults. Nancy's testimony that she was the primary caregiver for Josh and H.R.G, that she had a close relationship with H.R.G., that H.R.G. refused her offer of a room upstairs away from Gage, and that she thought H.R.G. and Gage had a normal relationship, could have undermined H.R.G.'s credibility.[1] And the fact that the jury acquitted Gage on count 1 suggests that they may have not found H.R.G. to be entirely credible so that testimony supporting Gage may have changed the outcome.

Nevertheless, the remainder of the state court's analysis is sufficient to assure me that the court's prejudice analysis is not "unreasonable" and is at least a "plausible outcome." *See Carter*, 819 F.3d at 948 (affirming conviction even though state court's prejudice analysis was flawed in some respects); *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002) ("A state court decision must be more than incorrect from the point of view of the federal court; AEDPA requires that it be 'unreasonable,' which means something like lying well outside the boundaries

---

[1] Gage argues that this court must accept as true the trial court's statement after the postconviction hearing that, "Nancy's testimony, if believed by the jury, would have undermined the credibility of [H.R.G]." Gage argues that this is a finding of fact that should be presumed correct. But this statement made by the trial court judge is not a "finding of fact" entered by a state court. *See Morris v. Bartow*, 832 F.3d 705, 709 (7th Cir. 2016) (findings of fact "entered" by the state court are presumed correct) (citing 28 U.S.C. § 2254(e)(1)("determination of a factual issue made by a State court shall be presumed to be correct")). The trial court judge was simply discussing the potential impact of Nancy's testimony. He went on to say multiple times that "a jury might discount her testimony as being a loving mother supportive of her son" and "her testimony might likely be discounted by the jury." Dkt. 10-18 at 14, 18. Moreover, on habeas review, this court must evaluate the court of appeals' analysis of the prejudice prong, not the trial court's decision. *Williams v. Bartow*, 481 F.3d 492, 497–98 (7th Cir. 2007).

of permissible differences of opinion."). The court stated that Josh's and Nancy's testimony was generally "consistent" with H.R.G.'s testimony and did not "undermin[e] the victim's account in any significant way." Dkt. 10-10 at 9, 10. This conclusion is not unreasonable. Josh and Nancy confirmed H.R.G.'s description of the various residences and of the general sleeping arrangements. And H.R.G. had already admitted at trial that her grandmother's sewing room was near the location of the assaults, that Josh was always in close proximity to the assaults, that Josh could have the heard the assaults or walked in the room at any time during the assaults, that she had declined her grandmother's offer of a bedroom upstairs because she wanted to be near Josh, and that the cabin where count 3 occurred was small and sound travelled through it. Josh's and Nancy's testimony would only corroborate H.R.G.'s own testimony on these points. The court of appeals found it particularly significant that H.R.G.'s account at trial was that Gage assaulted her after everyone had gone to sleep. Thus, Josh's and Nancy's testimony that they never witnessed any assaults would not have directly undermined H.R.G.'s account.

This is not a case in which defense counsel failed to call an alibi witness or eyewitness who would have directly contradicted a witness proffered by the state, *U.S. ex rel. Hampton v. Leibach*, 347 F.3d 219, 256 (7th Cir. 2003) (counsel's failure to investigate two potential eyewitnesses who would have contradicted eyewitness testimony at trial was prejudicial), or a case in which some excluded evidence would have obviously undermined the victim's credibility, *Sussman v. Jenkins*, 636 F.3d 329, 358 (7th Cir. 2011) (petitioner was prejudiced by counsel's failure to introduce evidence that alleged victim had falsely accused his father of sexual assault). Instead, the most significant import of Josh's and Nancy's testimony—that neither witness saw or heard anything that would have indicated to them that Gage was

sexually assaulting H.R.G—had minimal evidentiary value in light of the state's theory that Gage was calculating, manipulative, and assaulted H.R.G. only after Josh and Nancy were asleep in separate rooms. *See, e.g., Carter*, 819 F.3d at 949 (because potential witness testimony would have had "limited" value in light of the particular charges at issue, petitioner did not establish prejudice in counsel's failure to introduce it). Under the circumstances of this case, it was reasonable for the court of appeals to conclude that the likelihood of a different result was not substantial. *Richter*, 562 U.S. at 112 (in assessing prejudice under *Strickland*, the likelihood of a different result must be "substantial, not just conceivable.").

In sum, although trial counsel's performance was deficient in failing to investigate potential witnesses, the state court's resolution of the prejudice issue was not unreasonable within the meaning of 28 U.S.C. § 2254(d). Accordingly, Gage is not entitled to relief on this claim.

### 2. Failure to seek removal of "America's Most Wanted" plaque

Gage's second ineffective assistance of counsel claim is based on counsel's failure to request that the court remove the "America's Most Wanted" plaque commemorating Gage's arrest from the courthouse hallway. As with Gage's ineffective assistance claim regarding potential witnesses, the Wisconsin Court of Appeals resolved this claim by concluding that Gage had failed to show that he was prejudiced by counsel's inaction. The court stated that Gage had failed to "present any evidence at the postconviction hearing to suggest that any juror had seen the plaque, much less noticed Gage's name on it." Dkt. 10-10 at 9. Further, the court determined that it was "unlikely" that any juror would have seen the plaque, much less read it, "because the plaque was not prominently placed, and no juror mentioned having seen it when questioned about [his or her] knowledge of the case during voir dire." *Id.*

Gage has not shown that the court of appeals' decision is the result of an unreasonable application of *Strickland* or an unreasonable determination of the facts in light of the evidence. Gage argues that the jurors walked by the plaque every day, likely saw the plaque, and were prejudiced against Gage as a result. But he has not presented any evidence to contradict the state court's findings that the plaque was not prominent and that no juror reported seeing it. (Notably, the trial court judge stated during the postconviction hearing that he frequently walked through the hallway containing the plaque and had never noticed it.) I agree with the state court that Gage has failed to show a reasonable probability that he would have been acquitted if his counsel had moved for removal of the plaque. *See Strickland*, 466 U.S. at 694. Accordingly, Gage is not entitled to relief on this claim.

## B. Sentencing challenges

Gage brings two arguments relating to information used by the state court during sentencing. First, he argues that the state court violated his right to due process by relying on inaccurate information regarding his likelihood of sex offense recidivism. Second, he argues that the state court gave too much weight to his failure to appear for a mandatory court hearing while he was in Canada. I address each argument below.

### 1. Inaccurate information

All criminal defendants have a due process right to be sentenced on the basis of accurate information. *Promotor v. Pollard*, 628 F.3d 878, 888 (7th Cir. 2010) (citing *United States v. Tucker*, 404 U.S. 443, 447 (1972) and *Townsend v. Burke*, 334 U.S. 736, 741 (1948)). But not all inaccuracies deprive a defendant of due process; the incorrect information must be "materially untrue." *Promotor*, 628 F.3d at 888 (quoting *Townsend*, 334 U.S. at 741). A defendant who requests resentencing must establish that the sentencing court "relied on the

critical inaccurate information when announcing its sentence." *Id.* (citing *Simonson v. Hepp*, 549 F.3d 1101, 1107 (7th Cir. 2008)). A sentencing court "relies" on misinformation by "giv[ing] explicit attention to it, found[ing] its sentence at least in part on it, or giv[ing] specific consideration to the misinformation before imposing sentence." *Id.* (citation and quotations omitted).

Gage argues that the sentencing judge sentenced him based on materially incorrect information about his likelihood of recidivism. Gage points to the statement by the clinical psychologist who conducted his psychosexual evaluation after sentencing that Gage's "denial" is not a risk factor associated with increased recidivism. But this does not establish the falsity of the presentence investigation agent's opinion that sex offenders in denial "are at higher risk." Rather, as the Wisconsin Court of Appeals concluded, Gage has shown only that the agent's opinion "differed from the opinion of Gage's postconviction expert." Dkt. 10-10 at 13. The court of appeals also explained that the sentencing judge "could properly take into account allegations of sexual abuse relating to Gage's sister, his ex-wife, the daughter of his former girlfriend and the niece of his current wife, which were not reflected in the calculation of Gage's risk of sexual recidivism because they did not result in convictions that could be plugged into the actuarial instruments." *Id.* at 14. The court of appeals' analysis of this claim is reasonable, is not contrary to Supreme Court authority, did not involve an unreasonable application of federal law, and is not based upon an unreasonable determination of the facts. Accordingly, Gage is not entitled to relief on this claim.

### 2. Undue weight on Gage's move to Canada

Gage's final argument is that the sentencing court abused its discretion by placing undue weight on Gage's missing a court hearing after moving to Canada. But Gage cites only

Wisconsin case law in support of this claim and does not identify any constitutional right that was implicated by the state court's exercise of its sentencing discretion. Therefore, I agree with the state that this claim raises only a violation of state law and does not implicate a constitutional or federal claim on which Gage could obtain habeas relief. *See Arnold v. Dittmann*, 901 F.3d 830, 835 (7th Cir. 2018) ("[E]rrors of state law are not cognizable on habeas review."); *Kyles v. Meisner,* No. 12-CV-835, 2013 WL 823416, at *8 (E.D. Wis. Mar. 6, 2013) (challenging to "trial court's sentencing determination on the grounds it placed undue weight on one factor and failed to adequately explain the basis for its sentence" involved issue of state law that could not provide habeas relief).

Even if Gage had identified a constitutional basis for this claim, I would conclude that the Wisconsin Court of Appeals' adjudication of the claim was appropriate. The court concluded that the sentencing judge's inference that Gage had attempted to flee prosecution was amply supported by the record and that Gage's move was only one among many factors that the judge considered at sentencing. Dkt. 10-10 at 14. My own review of the sentencing transcript confirms that this analysis is reasonable. Accordingly, Gage is not entitled to relief on this claim either.

## C. Certificate of appealability

The only remaining question is whether to grant Gage a certificate of appealability. Under Rule 11 of the Rules Governing Section 2254 Cases, the court must issue or deny a certificate of appealability when entering a final order adverse to a petitioner. To obtain a certificate of appealability, the applicant must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Tennard v. Dretke*, 542 U.S. 274, 282 (2004). This means that "reasonable jurists could debate whether (or, for that matter, agree that) the

petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations and citations omitted).

Gage is entitled to a certificate of appealability on his claim that his trial counsel was ineffective for not investigating or calling Josh Gage and Nancy Gage as witnesses at trial. That question is close enough that reasonable jurists might resolve it differently. The proper resolution of his other claims, however, is not reasonably debatable.

## ORDER

IT IS ORDERED that:

1. Petitioner Patrick J. Gage's petition for a writ of habeas corpus under 28 U.S.C. § 2254 is DENIED.

2. Gage is GRANTED a certificate of appealability solely on his claim of ineffective assistance of counsel based on counsel's failure to investigate and call Josh Gage and Nancy Gage as witnesses. He may seek a certificate from the court of appeals under Fed. R. App. P. 22 for his other claims.

Entered April 29, 2019.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge